ADOLPHO A. BIRCH, JR., J„
concurring and dissenting.
I concur in the conclusion of the majority that Reid’s conviction should be affirmed. As to the sentence of death, however, I respectfully dissent. I continue to adhere to my view that the comparative proportionality review protocol currently embraced by the majority is inadequate to shield defendants from the arbitrary and disproportionate imposition of the death *324 penalty. See Tenn.Code Ann. § 39-13-206(c)(1)(D) (1995 Supp.).
I have repeatedly expressed my displeasure with the current protocol since the time of its adoption in State v. Bland, 958 S.W.2d 651 (Tenn.1997). See State v. Thacker, 164 S.W.3d 208, 256, 2005 WL 984397 (Tenn., April 27, 2005)(Birch, J., concurring and dissenting); State v. Thomas, 158 S.W.3d 361, 384, (Tenn.2005) (Birch, J., concurring and dissenting); State v. Faulkner, 154 S.W.3d 48, 64 (Tenn.2005) (Birch, J., concurring and dissenting); State v. Cole, 155 S.W.3d 885, 910 (Tenn.2005) (Birch, J., concurring and dissenting); State v. Robinson, 146 S.W.3d 469, 529 (Tenn.2004) (Birch, J., concurring and dissenting); State v. Leach, 148 S.W.3d, 42, 68 (Tenn.2004) (Birch, J., concurring and dissenting); State v. Davis, 141 S.W.3d 600, 632 (Tenn.2004) (Birch, J., concurring and dissenting); State v. Berry, 141 S.W.3d 549, 589 (Tenn.2004) (Birch, J., concurring and dissenting); State v. Holton, 126 S.W.3d 845, 872 (Tenn.2004) (Birch, J., concurring and dissenting); State v. Davidson, 121 S.W.3d 600, 629-36 (Tenn.2003) (Birch, J., dissenting); State v. Carter, 114 S.W.3d 895, 910-11 (Tenn.2003) (Birch, J., dissenting); State v. Reid, 91 S.W.3d 247, 288-89 (Tenn.2002) (Birch, J., concurring and dissenting); State v. Austin, 87 S.W.3d 447, 467-68 (Tenn.2002) (Birch, J., dissenting); State v. Stevens, 78 S.W.3d 817, 852 (Tenn. 2002) (Birch, J., concurring and dissenting); State v. McKinney, 74 S.W.3d 291, 320-22 (Tenn.2002) (Birch, J., concurring and dissenting); State v. Bane, 57 S.W.3d 411, 431-32 (Tenn.2001) (Birch, J., concurring and dissenting); State v. Stout, 46 S.W.3d 689, 720 (Tenn.2001) (Birch, J., concurring and dissenting); Terry v. State, 46 S.W.3d 147, 167 (Tenn.2001) (Birch, J., dissenting); State v. Sims, 45 S.W.3d 1, 23-24 (Tenn.2001) (Birch, J., concurring and dissenting); State v. Keen, 31 S.W.3d 196, 233-34 (Tenn.2000) (Birch, J., dissenting). As previously discussed, I believe that the three basic problems with the current proportionality analysis are that: (1) the proportionality test is overbroad,[1] (2) the pool of cases used for comparison is inadequate,[2] and (3) review is too subjective.[3] I have previously discussed, in *325 depth, my perception that these flaws undermine the reliability of the current proportionality protocol. See State v. Godsey, 60 S.W.3d at 793-800 (Birch, J., concurring and dissenting). I continue to adhere to my view that the current comparative proportionality protocol is woefully inadequate to protect defendants from the arbitrary or disproportionate imposition of the death penalty. Accordingly, I respectfully dissent from that portion of the majority opinion affirming the imposition of the death penalty in this case.

APPENDIX

(Excerpts from the Court of Criminal Appeals’ Decision)
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 14, 2003 Session
STATE OF TENNESSEE v. PAUL DENNIS REID, JR.
Direct Appeal from the Circuit Court for Montgomery County
No. 38887 John H. Gasaway, III, Judge
No. M2001-02753-CCA-R3-DD-Filed December 29, 2003
The appellant, Paul Dennis Reid, Jr., was found guilty by a jury of two counts of premeditated murder, two counts of felony murder, two counts of especially aggravated kidnapping, and one count of especially aggravated robbery. The felony murder convictions were merged into the premeditated murder convictions. Thereafter, the jury sentenced the appellant to death based upon the existence of three aggravating circumstances: the appellant had previously been convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; the murders were committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of defendant or another; and the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. The trial court sentenced the defendant as a violent offender to twenty-five years imprisonment for especially aggravated robbery and especially aggravated kidnapping, to run consecutively to his sentences for first degree murder and to a prior out-of-state sentence. On appeal, appellant presents forty-five issues. After an extensive review of the record and the applicable law, we find that none of these issues warrants a reversal of this case. Therefore, the judgments of the trial court are AFFIRMED.
JeRry L. Smith, J., delivered the opinion of the court, in which David G. Hayes and Thomas T. Woodall, JJ., joined.
James A. Simmons and Thomas F. Bloom, Nashville, Tennessee for the appellant, Paul Dennis Reid, Jr.
Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the ap-pellee, State of Tennessee.
OPINION
[Deleted: Factual Background]

Analysis

I. Validity of Search Warrants
Appellant contends the trial court erred in denying his motion to suppress evidence
*326 seized pursuant to search warrants 145, 146, and 189. Specifically, appellant argues that warrant 145, authorizing the search of his “red 1997 Ford Escort LX four door ... [,] ” and warrant 146, authorizing the search of his home located at 1424 Ordway Place, are invalid because they did not describe with particularity the items ultimately seized. Appellant further claims that the warrants are invalid for lack of probable cause due to the passage of time and that the warrants do not establish a nexus between the criminal activity and his home and the criminal activity and his car. Appellant challenges warrant 189 on the grounds that he did not receive an exact copy of the warrant authorizing the police to obtain hair and blood samples from him and that the warrant lacked probable cause because it failed to state that the police obtained blood and hair samples from the victims to compare to his. Appellant raised these same allegations with regard to warrants 146 and 149 on his direct appeal of the Captain D’s murders[1] and the Tennessee Supreme Court found these allegations to be without merit.[2] Reid, 91 S.W.3d at 273-76.
The Supreme Court set forth a detailed analysis examining the requirement of particularity for search warrants, the requirement of a nexus between the criminal activity and the area to be searched, and the requirement of Tennessee Rule of Criminal Procedure 41 that the serving officer leave a copy of the search warrant with the person on whom the search warrant is being served.
In discussing the particularity required for search warrants, the court stated:
Under both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution a search warrant must contain a particular description of the items to be seized. See State v. Henning, 975 S.W.2d 290, 296 (Tenn.1998) (citing cases). This requirement serves as a limitation, both upon governmental intrusion into a citizen’s privacy and property rights and upon the discretion of law enforcement officers conducting the search. Id. To satisfy the particularity requirement, a warrant “must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized.” Henning, 975 S.W.2d at 296 (internal quotations and citations omitted).
Reid, 91 S.W.3d at 273.
The court quoted with approval the following language from Lea v. State, 181 Tenn. 378, 181 S.W.2d 351, 352-53 (1944), which sets forth the particularity requirement for search warrants.
[W]here the purpose of the search is to find specific property, it should be so particularly described as to preclude the possibility of seizing any other. On the other hand, if the purpose be to seize not specified property, but any property of a specified character which, by reason of its character, and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description, save as to such *327 character, place and circumstances, would be unnecessary, and ordinarily impossible.
Reid, 91 S.W.3d at 273-74.
Applying the principles set forth in Lea to the warrants at issue in Reid, the court noted that
[wjarrants 146 and 149 authorized searches of the defendant’s residence for items “which may be identified” as property belonging to the victims or the restaurants, and any items that “may be used to cause the death of the victims.” Warrant 149 additionally authorized a search for “any and all financial records to include those indicating” money paid by the defendant on an automobile lease around the time of the murders. An affidavit was attached to each warrant, setting forth the nature and circumstances of the crimes and noting several items that had been taken from the restaurants, including bank bags.
Id. at 274. Ultimately, the court affirmed the decisions of the trial court and this Court, which determined that the warrants met the particularity requirement because “the warrants described the character of the property with sufficient particularity ‘to enable the searcher to reasonably ascertain and identify’ the items subject to seizure.” Id.
In response to appellant’s arguments that the information in the affidavits accompanying the warrants was stale and there was no probable cause to believe that evidence of the crimes would be located at appellant’s residence, the court examined the requirement that there be a nexus between the criminal activity and the area to be searched and found that
To establish probable cause an affidavit must set forth facts from which a reasonable conclusion may be drawn that the evidence will be found in the place for which the warrant authorizes a search. State v. Vann, 976 S.W.2d 93, 105 (Tenn.1998); State v. Longstreet, 619 S.W.2d 97, 99 (Tenn.1981). In addition, the affidavit must contain information which will allow a magistrate to determine whether the facts are too stale to establish probable cause at the time issuance of the warrant is sought. Vann, 976 S.W.2d at 105. While the lapse of time between the commission of a crime and the issuance of a search warrant may affect the likelihood that incriminating evidence will be found, probable cause is a case-by-case determination. State v. Meeks, 876 S.W.2d 121, 124 (Tenn.Crim.App.), perm. app. denied (Tenn.1993). In making this determination, courts should consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct. Courts also should consider the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator’s opportunity to dispose of incriminating evidence. State v. Dellinger, 79 S.W.3d 458, 469-70 (Tenn.2002); State v. Smith, 868 S.W.2d 561, 572 (Tenn.1993).
... [T]he criminal conduct under investigation was not an isolated event. As indicated in the warrants, the crimes occurred almost one month apart, with the last crime committed on March 23, 1997, less than three months prior to the time the warrants were being sought. The warrants sought any items that had been taken from the restaurants or the victims or that may have been used to cause the death of the victims. The affidavits set out the circumstances of the Captain D’s and McDonald’s robberies, including the fact that the only person who had survived the crimes had been repeatedly stabbed and left for *328 dead. The affidavits farther noted that the defendant’s fingerprint had been recovered from an item belonging to one of the Captain D’s victims, that the murder scenes were extremely bloody, that the victims’ blood could be on the defendant’s clothing, and that the defendant could still have in his possession or on his premises instruments of violence used to murder the victims or personal items belonging to the victims. Clearly, the affidavits provide an explanation for why the items sought by the warrants are capable of, and are in fact, likely to be hidden in the defendant’s residence .... Where, as here, a perpetrator believes he has eliminated or incapacitated all witnesses so that law enforcement officials are unlikely to discover his criminal activity, it is neither unreasonable nor unlikely that the perpetrator would keep clothing, or the murder weapons, or items taken during the crime at his residence. See Smith, 868 S.W.2d at 572. Therefore, we conclude that the trial court and Court of Criminal Appeals correctly found that the affidavits set forth sufficient facts from which the magistrate reasonably could have concluded that a nexus existed between the crime and the place to be searched and that the facts were sufficiently recent to establish probable cause.
Reid, 91 S.W.3d at 275-76.
Appellant has not shown how the evidence preponderates against the trial court’s findings in this case. “[T]he trial court’s findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.” State v. Odom, 928 S.W.2d 18, 23 (Tenn.1996). However, the application of the law to the facts as found by the trial court is a question of law, which the appellate court reviews de novo. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn.1997).
Appellant concedes that the Supreme Court held two of the search warrants at issue in this case valid in the Captain D’s appeal but argues that this court should not follow the reasoning set forth by the Supreme Court because it misinterpreted and misapplied the principles set forth in Lea. Appellant argues that the less exacting particularity requirement set forth in Lea applies only when the property to be seized is of an illicit or illegal nature. Appellant contends that the danger in failing to abide by the Lea court’s precise holding is that a more expansive interpretation of the case will result in the “general searches” prohibited by the state and federal constitutions. Appellant maintains that, because the warrants at issue do not comply with the requirements set forth in Lea, the warrants are constitutionally defective. This court, .however, adopts the reasoning of the Supreme Court in Reid, 91 S.W.3d at 273-76, and determines that warrants 145 and 146 are valid.
Appellant contends that he did not receive a copy of warrant 189 at the time the warrant was executed in violation of Tennessee Rule of Criminal Procedure 41. In dismissing the identical issue with respect to warrant 149 in Reid, the Supreme Court found:
It is undisputed that the officers executing the warrants were aware of the defendant’s whereabouts. It is also undisputed that the detectives left a copy of the search warrant locked inside the defendant’s residence, from which the property was taken. The rule requires nothing more.... [T]here was no one present on whom the officers could serve the warrant at the time it was executed; therefore, it was not possible for the officers to leave a copy with the person being served. Rule 41(c) does *329 not require officers to deliver a copy of the search warrant to a person who is not present. Instead, subsection (d) of Rule 41 indicates that an officer taking property under a warrant shall “give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at a place from which the property was taken.” (Emphasis added.) In this case, the officers left the warrant at the defendant’s residence, the place from which the property was taken. This issue is without merit.
Reid, 91 S.W.3d at 276.
In pertinent part, Tennessee Rule of Criminal Procedure 41 provides: “[T]he failure of the serving officer where possible to leave a copy with the person or persons on whom the search warrant is being saved, shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure.” Tenn. R.Crim. P. 41 (emphasis added).
Detective Postiglione testified in a pretrial motion hearing that he and Detective Rolland served a copy of warrant 189 on appellant at the Sheriffs Department at the Davidson County Criminal Justice Center. The search warrant shows that it was executed and returned on the same date it was issued, August 6, 1997. Therefore, it appears that Tennessee Rule Criminal Procedure 41(c) was satisfied.
Appellant asserts as a final argument that warrant 189 lacked probable cause to permit seizure of appellant’s hair and blood because the warrant failed to state hair and blood samples had been obtained from either of the victims or the crime scenes that could be used to compare to appellant’s hair or blood. The warrant states, however, that “Paul Dennis Reid Jr. may have been cut or injured to the point where bleeding occurred, thus leaving his blood either on the victims or in the area [of] the crime scenes. It is also possible that during this contact Paul Dennis Reid Jr. left behind body hairs either on the victims or in the area of the crime scenes.” Thus, the warrant provided an explanation for why the items sought may be found on appellant and set forth sufficient facts for a magistrate to reasonably conclude that a nexus existed between the crime and appellant’s hair and blood. Based on the reasoning set forth by the Supreme Court in appellant’s prior appeal of the Captain D’s murders and the reasoning set forth above, this Court finds warrant 189 to be constitutionally valid. This issue is without merit.
II. Crime Scene Video
Appellant contends that the trial court erred in admitting the videotape of the crime scene into evidence. Specifically, appellant contends that the videotape was not necessary to establish where the bodies were found or the extent of the victims’s injuries because the videotape was merely cumulative of testimony of other witnesses. Appellant further contends that the depiction of the crime scene in the videotape was “gruesome and graphic” and, thus, prejudicial. Appellant submits that the only purpose of the video was to inflame and prejudice the jury against appellant.
The admissibility of a videotape of a crime scene is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion. State v. Carruthers, 35 S.W.3d 516, 576-57 (Tenn. 2000), cert. denied, 533 U.S. 953, 121 S.Ct. 2600, 150 L.Ed.2d 757 (2001); State v. *330 Banks, 564 S.W.2d 947, 949 (Tenn.1978); see also State v. Bigbee, 885 S.W.2d 797, 807 (Tenn.1994); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn.1993), cert. denied, 511 U.S. 1046, 114 S.Ct. 1577, 128 L.Ed.2d 220 (1994). As the Supreme Court stated in Carruthers, the modern trend is to vest more discretion in the trial judge’s rulings on admissibility. Carruthers, 35 S.W.3d at 577 (citing Banks, 564 S.W.2d at 949; State v. Michael Carlton Bailey, No. 01C01-9403-CC-00105, 1995 WL 424996, at *7 (Tenn.Crim.App. at Nashville, July. 20, 1995), perm, to appeal denied, (Tenn. Jan. 8, 1996).
Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Tenn. R. Evid. 401. However, relevant evidence “may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.” Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. Carruthers, 35 S.W.3d at 577 (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn.Crim.App.1993)). The court must still determine the relevance of the evidence and weigh its probative value against any undue prejudice. Id. The term “undue prejudice” has been defined as “[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.” Banks, 564 S.W.2d at 950-51. In Banks, the Supreme Court gave the trial courts guidance for determining the admissibility of relevant photographic evidence and determined that a trial court should consider: (1) the accuracy and clarity of the picture and its value as evidence; (2) whether the picture depicts the body as it was found; (3) the adequacy of testimonial evidence in relating the facts to the jury; and (4) the need for the evidence to establish a prima facie case of guilt or to rebut the defendant’s contentions. Id.
In this case, the trial court found that the video aided the jury in understanding the testimony of medical examiners, crime scene investigators, and witnesses. The trial court noted that the jury was from Memphis and presumably unfamiliar with the area and Dunbar Cave State Park. The trial court also found that the video depicted the location of the bodies and was shown to document the position of the bodies in relation to the lake, the trail described by investigators and witnesses, the parking lot, and the cave. The trial court determined that the video was not “particularly gruesome.” Appellant advances the argument that the video was graphic and gruesome only because the video shows the bodies of the victims as they were found at the crime scene. The crime scene video of most murders will necessarily depict the bodies of the victims as they were found. If this court were to accept appellant’s argument in this regard, no crime scene videotapes of murders would ever be admissible.
This Court further concludes that while the videotape and the other evidence admitted in this case may have contained some of the same material, it was not error to admit the videotape. See Bigbee, 885 S.W.2d at 807 (holding that it was not error to admit a videotape of the crime scene although it depicted images similar to those of photographs also admitted). Each of the different forms of evidence admitted in this case served different purposes and were probative of the issues to be decided by the jury. As a result, the trial court did not abuse its discretion in admitting the videotape into evidence. See id.; see also State v. Kelvin Anthony Lee, No. 02C01-9603-CC-00085, 1997 WL *331 686258, at *9 (Tenn.Crim.App. at Jackson, Nov. 5, 1997), perm, to appeal denied, (Tenn. Aug. 8, 1998.) The probative value of the video of the crime scene is not outweighed by its prejudicial effect. This issue is without merit.
III. Grand Jury Rough Notes
Appellant contends that the trial court erred by refusing to order the State to disclose grand jury testimony. In a pretrial motion, appellant asked the trial court to require disclosure of grand jury testimony, including notes taken by the Assistant Attorney General “for the purpose of ascertaining whether the witness’ grand jury testimony is consistent with the testimony given by the witnesses before the court in the trial”, at least to the extent that testimony was revealed in rough notes of the testimony taken by the assistant district attorney general. In the alternative, the motion sought for the court to review the notes in-camera to ascertain whether or not the witnesses’ testimony was consistent with the testimony that the witnesses gave before the grand jury. The trial court granted appellant’s motion to the extent the grand jury testimony was revealed in rough notes taken by the assistant attorney general but denied it as to the disclosure of grand jury testimony. The State responded that it did not possess any rough notes of the grand jury testimony.
On appeal, appellant relies on the exception to the rule of secrecy of grand jury testimony found in Tennessee Rule of Criminal Procedure 6(k)(2), which allows a member of the grand jury to be “required by the court to disclose the testimony of a witness examined before them, for the purpose of ascertaining whether it is consistent with that given by the witness before the court,” to argue that the trial court should have ordered the State to disclose its rough notes of the grand jury testimony. Appellant argues that “[bjecause the trial court’s ruling allowed the State to take such an incredible position, ... the court erred in so ruling.” The rule does not require the district attorney’s rough notes of grand jury testimony to be turned over to opposing counsel, the rule requires the disclosure of witness testimony for the purpose of ascertaining the consistency of the witness’ testimony. Appellant has failed to show any error committed by the trial court. The appellant merely asked for the notes of the testimony that were taken by the prosecutor, and there were no actual allegations of inconsistencies in the grand jury testimony. Moreover, the State cannot produce documents it does not possess. This issue is without merit.
IV. Limited Jury Questionnaire
Appellant argues that the trial court erred by denying his motion to disseminate a questionnaire to prospective jurors inquiring about the jurors’ gender, birth date, educational background, and economic class. Specifically, appellant argues that the court’s questionnaire did not cover the topics in sufficient detail to evaluate the representation of cognizable groups, relying upon Duren v. Missouri, 489 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), which holds that a defendant has a right to challenge the venire to ensure adequate representation of cognizable groups.
Appellant fails to cite to the portion of the appellate record containing the questionnaire he requested be disseminated to the jury. Further, it does not appear that the questionnaire submitted to the jurors by the trial court was made a part of the appellate record. “Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as *332 waived in this court.” Tenn. R. Ct.Crim. App. 10(b).
Moreover, the control of voir dire proceedings rests within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion unless clear abuse appears on the face of the record. State v. Howell, 868 S.W.2d 238, 247 (Tenn.1993), cert. denied, 510 U.S. 1215, 114 S.Ct. 1339, 127 L.Ed.2d 687 (1994). Furthermore, a trial judge has a right to participate in voir dire examination. Tenn. R.Crim. P. 24(a). Tennessee Rule of Criminal Procedure 24(a) provides: “The court may put to the respective jurors appropriate questions regarding their qualifications to serve as jurors in the case.... ” The trial court found that its juror questionnaire covered the topics sufficiently. Appellant has failed to show that the inquiries made by the trial court were improper or inadequate and has failed to show any abuse of discretion by the trial court. Thus, this issue is without merit.
V. Information on Past Performance of Prospective Jurors
Appellant contends that the trial court erred in denying his motion requiring the State to produce any information it had with regard to the past performance of prospective jurors. Appellant argued that he did not have the funds to hire an investigator to discover this information. The trial court denied the motion and ruled that such information could be found in the juror questionnaire and developed through voir dire. Appellant contends on appeal that the trial court’s ruling violated his right to a jury trial found in Article I, Section 9 of the Tennessee Constitution and violated his due process rights found in the federal and state constitutions. Moreover, appellant contends that the court’s questionnaire did not adequately address this issue and that voir dire is an insufficient tool because of the possibility of false statement or faulty memory as to past service.
Appellant fails to cite to the portion of the appellate record containing the questionnaire he challenges with respect to this issue. Further, it does not appear that the questionnaire submitted to the jurors by the trial court was made a part of the appellate record. “Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.” Tenn. R. Ct.Crim.App. 10(b). Appellant’s brief and the appellate record are devoid of any evidence that appellant was prejudiced by the trial court’s failure to require the State to provide appellant with information regarding the past performance of prospective jurors. This issue is without merit.
VI. Constitutionality of Tennessee Code Annotated Section 22-1-102
Appellant challenges two subsections of Tennessee Code Annotated section 22-1-102, which deem certain persons incompetent to act as jurors. Specifically, appellant contends that the statute is unconstitutional to the extent it excludes persons who have been convicted of certain infamous offenses, persons of unsound mind, and habitual drunkards. Tenn.Code Ann. § 22-l-102(a)(l), (4).
In making his argument, appellant notes that jury service is a right secured to all citizens under the federal and state constitutions. Georgia v. McCollum, 505 U.S. 42, 48-50, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); Wolf v. Sundquist, 955 S.W.2d 626, 633 (Tenn.Ct.App.1997). He argues that Tennessee Code Annotated section 22-1-102 is overly broad in excluding all felons *333 from jury service when some felons have rehabilitated themselves to the extent they could serve impartially on a jury. He further contends that the statute is overly broad in excluding “habitual drunkards” from serving on juries as some functional alcoholics are capable of serving in an impartial and attentive manner so long as they are not under the influence of alcohol at the time of trial. Finally, appellant contends that the statute is vague as it relates to persons of “unsound mind.” Appellant argues that there is no accepted definition of unsound mind in the psychiatric or psychological community. Appellant contends that because the term can mean anything the court wants it to mean, it is void for vagueness.
As the State noted in its brief, the United States Supreme Court has held that states are “free to prescribe qualifications for [their] jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community.” Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). There is no evidence that the operation of this statute violates the fair cross-section requirement of the Sixth Amendment. This issue is without merit.
VII. Exclusion of Jurors Based on Religion
Appellant filed a pretrial motion to prevent prospective jurors who stated that they could not impose the death penalty due to their religious convictions from being excluded from the jury. Appellant contends that the trial court erred in denying his motion to prevent exclusion of prospective jurors because of their religion. Appellant argues that the exclusion of jurors who claim that they cannot impose the death penalty due to their religious convictions violates the Tennessee Constitution, which provides that “no political or religious test shall ever be required as a qualification for jurors.” The trial court denied appellant’s motion, stating that it would use the tests formulated in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) to determine juror qualification.
Appellant raised this issue in the appeal of his conviction for the Captain D’s murders. The Tennessee Supreme Court ultimately held that the exclusion of prospective jurors by a trial court because of their moral or religious based reluctance to impose the death penalty is not error. Reid, 91 S.W.3d at 289-90. “In this regard, potential jurors are removed for cause not because of their religious opinion or affiliation but because the jurors are unable to view the proceedings impartially and perform their duties in accordance with the juror’s oath.” Id. at 290. Questioning of a juror with regard to the death penalty does not amount to a religious test. Id. (citing Wolf, 955 S.W.2d at 631.) Appellant acknowledges that the Tennessee Supreme Court has rejected this argument but makes the argument in order to preserve it for later review. Accordingly, this issue is without merit.
VIII. Exclusion of Jurors who Were not “Death Qualified”
Pretrial, appellant moved the court to refrain from excluding jurors for cause based on their opposition to the imposition of the death penalty because the exclusion of jurors who are not “death qualified” under Witherspoon and Wainwright denied him a constitutional right to have an impartial jury composed of a fair cross-section of the community. Appellant acknowledges the Tennessee Supreme Court *334 has rejected this argument but asserts it in order to preserve later review. Accordingly, this argument is without merit.
IX.Separate Juries on Issues of Guilt and Sentencing
Appellant moved the trial court to have one jury determine his guilt or innocence and a second jury to determine his sentence, which the trial court denied. On appeal, appellant asserts that separate juries are necessary to ensure his right to a fair trial under the Tennessee and federal constitutions. This argument was rejected by our supreme court in State v. Dellinger, 79 S.W.3d 458, 478-79 (Tenn.2002), which appellant acknowledges. Appellant asserts this issue in order to preserve it for later review. This issue is without merit.
X.Constitutionality of Tennessee Code Annotated Section 39-13-204(h)
Appellant moved the trial court to declare Tennessee Code Annotated section 39-13-204(h) unconstitutional, arguing that prohibiting the trial court from informing the jury as to the effect of a nonunanimous verdict in the sentencing phase violates his state and federal constitutional rights to a fair trial. Appellant acknowledges that this argument was rejected by the Tennessee Supreme Court in State v. Hall, 958 S.W.2d 679, 718 (Tenn.1997), but asserts the issue in order to preserve it for later review. Accordingly, this issue is without merit.
XI.Constitutionality of Death Penalty
Appellant contends that the death penalty statute is unconstitutional because it constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution. Appellant concedes that this argument was rejected by the supreme court in Hall, 958 S.W.2d at 718, but asserts this issue in order to preserve it for later review. Accordingly, this issue is without merit.
XII.Constitutionality of Tennessee Code Annotated Sections 39-13-204 and 39-13-206
Appellant contends that Tennessee’s death penalty statutes are unconstitutional. However, he fails to present any constitutional challenges to the death penalty statutes that have not been previously reviewed and rejected.
Appellant relies upon the case of United States v. Fell, 217 F.Supp.2d 469 (D.Vt.2002), in arguing that Tennessee’s capital sentencing scheme, particularly Tennessee Code Annotated section 39-13-204(c), is unconstitutional because it allows the death penalty to be imposed based on evidence that is not subject to the guarantees of reliability and trustworthiness required by the due process and confrontation clauses of the federal constitution. This Court rejected that argument in State v. Gdongalay Berry, No. M2001-02023-CCA-R3-DD, 2003 WL 1855099, at *7 (Tenn.Crim.App. at Nashville, Apr. 10, 2003) (holding that Tennessee’s sentencing scheme, including Tennessee Code Annotated section 39-13-204(c), is constitutional). Appellant argues, however, that the Berry court erred in finding Tennessee’s sentencing scheme constitutional. Specifically, appellant contends that the court erred by rejecting the analysis of the Fell court and adopting the reasoning of United States v. Matthews, 246 F.Supp.2d 137 (N.D.N.Y.2002). Appellant maintains that both Matthews and Berry ignore a central theme in United States Supreme Court jurisprudence: that because death is a unique punishment in terms of its irrevoca-bility, it requires more rigorous and scrupulous procedures than other criminal *335 matters to ensure maximum reliability. Further, appellant contends that because the Tennessee sentencing scheme does not contain a provision analogous to Federal Rule of Evidence 408, allowing the trial court to exclude evidence if its prejudicial effect outweighs its probative value, the trial court must admit any evidence that is “relevant” or “probative” to the issue of punishment, regardless of whether the evidence is reliable or more prejudicial than probative. Accordingly, appellant contends that the Berry court erred in upholding the constitutionality of Tennessee Code Annotated section 39-13-204(e) and urges this court to dispense with the Berry opinion, find the statute unconstitutional, and reverse this case.
The death penalty statutes have repeatedly been held constitutional. See e.g., State v. Keen, 31 S.W.3d 196, 233 (Tenn.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); State v. Nesbit, 978 S.W.2d 872, 902 (Tenn.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1359, 143 L.Ed.2d 520 (1999); State v. Vann, 976 S.W.2d 93, 117 (Tenn.1998), cert. denied, 526 U.S. 1071, 119 S.Ct. 1467, 143 L.Ed.2d 551 (1999); State v. Bland, 958 S.W.2d 651, 663 (Tenn.1997), cert. denied, 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 686 (1998); Bigbee, 885 S.W.2d at 813-14; State v. Smith, 857 S.W.2d 1, 21-22 (Tenn.1993), cert. denied, 510 U.S. 996, 114 S.Ct. 561, 126 L.Ed.2d 461 (1993); State v. Bane, 853 S.W.2d 483, 488 (Tenn.1993); see also Berry, 2003 WL 1855099, at *4-*5.
XIII.Failure to Dismiss Indictment Pursuant to Article I, Section 19 of Tennessee Constitution
Appellant contends that the trial court erred in denying his motion to dismiss the indictment based upon its violation of Article I, Section 19 of the Tennessee Constitution. Appellant acknowledges that the supreme coui't rejected this argument in Van Tran, 864 S.W.2d at 481, but asserts the issue on appeal to preserve it for later review. Accordingly, this issue is without merit.
XIV.[Deleted: Failure to Dismiss Indictment Because Aggravating Factors not Listed in Indictment]
XV.Failure to Allow Defendant to Address the Jury Last
Appellant contends that the trial court erred in failing to allow him to address the jury last during closing arguments in the penalty phase of the trial. This issue has been rejected by our supreme court. Smith, 857 S.W.2d at 24. This issue is without merit.
XYI. Reliability of DNA Testing
Appellant contends that the trial court erred in denying his motion for a pretrial hearing to determine the reliability of the polymerase chain reaction (“PCR”) DNA testing used in this case, pursuant to McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257 (Tenn.1997). In McDaniel, the Supreme Court clarified the standards for the admission of scientific evidence under Tennessee Rules of Evidence 702 and 703. Subsequently, the Tennessee Supreme Court held that pursuant to Tennessee Code Annotated section 24-7-117, mitochondrial DNA evidence met the general standards for admission of scientific or technical evidence and could be allowed as a method of proving identification without expert testimony as to its reliability. State v. Scott, 33 S.W.3d 746, 756-60 (Tenn.2000). The trial court herein relied on Scott and ruled that a pretrial hearing to determine the reliability of the DNA testing was not necessary. Appellant argues that, although Scott held that a McDan *336 iel hearing did not have to be conducted as to mitochondrial DNA testing, this case involves PCR DNA testing rather than mitochondrial DNA testing. Appellant further contends that, “[b]ecause the scientific reliability of the specific type of testing used in this case has never been established, the trial court erred in failing to order a Daniel [sic] hearing.”
The Tennessee Supreme Court has held “the PCR method of DNA analysis an inherently trustworthy and reliable method of identification.” State v. Begley, 956 S.W.2d 471, 477 (Tenn.1997). In Begley, the court held:
[thereafter, the PCR method of DNA analysis shall be admissible into evidence without antecedent expert testimony as to its trustworthiness and reliability, pursuant to Tenn.Code Ann. § 24 — 7—117(b)(1). As provided by that statute, parties are nevertheless allowed to offer proof that DNA analysis is not trustworthy and reliable. Tenn.Code Ann. § 24 — 7—117(b)(2). For example, a party can challenge the reliability of a particular test in any given case by a showing of sloppy handling of samples, failure to train the personnel performing the testing, failure to follow protocol, and the like. Such a challenge, however, will go to the weight, not the admissibility, of DNA evidence.
Id. at 478 (footnote omitted). Herein, PCR DNA testing was utilized by the TBI and LabCorp expert witnesses. In accordance with Begley, we conclude that the PCR DNA evidence was admissible without antecedent expert witness testimony as to its trustworthiness and reliability. Accordingly, this issue is without merit.
XVII. Admission of Victim Impact Evidence
Appellant contends that the trial court erred in denying his motions to exclude all victim impact evidence and challenges the victim impact jury instruction in State v. Nesbit, 978 S.W.2d 872, 892 (Tenn.1998). Specifically, appellant argues victim impact testimony is prejudicial and irrelevant under the capital sentencing structure established by Tennessee Code Annotated section 39-13-204(g)(l) and Nesbit, 978 S.W.2d at 892, and should be excluded. Appellant asserts that Tennessee Code Annotated section 39 — 13—204(g)(1) mandates that a jury “shall” return a verdict of death once a jury decides that aggravating circumstances exist and they outweigh any mitigating circumstances. Appellant asserts that, under Nesbit, the jury is not permitted to consider the victim impact evidence until after finding that at least one aggravating circumstance exists and that the aggravating circumstance(s) outweigh any mitigating circumstances beyond a reasonable doubt.
Appellant also argues that the Nesbit jury instruction is illogical. The instruction reads as follows:
You may consider the victim impact evidence in determining the appropriateness of the death penalty only if you first find that the existence of one or more aggravating circumstances has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating cireumstance(s) found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.
Nesbit, 978 S.W.2d at 892.
Appellant contends that the jury charge in effect “moots” the victim impact evidence because Tennessee Code Annotated section- 39-13-204(g)(l) requires the jury to return a verdict of death if it finds that an aggravating circumstance or circumstances exist beyond a reasonable doubt *337 and outweigh any mitigating circumstances beyond a reasonable doubt.
Victim impact evidence has been declared constitutional by the United States Supreme Court and the Tennessee Supreme Court. Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); Nesbit, 978 S.W.2d at 889. Furthermore, the argument advanced by appellant that victim impact testimony is irrelevant and should be excluded under Tennessee’s current capital sentencing system, has also been rejected by the Tennessee Supreme Court. See Reid, 91 S.W.3d at 282-83 (holding that any contradiction between the statute and the Nesbit instruction inures to the benefit of the defendant; therefore, this argument does not entitle the defendant to relief). This issue is without merit.
XVIII. [Deleted: Amendment of Indictment]
XIX. Failure to Consolidate This Case with Davidson County Cases
On August 13, 1998, appellant filed a motion to consolidate this case with the two pending cases in Davidson County pursuant to Tennessee Rules of Criminal Procedure 13(a) and 8(b). The trial court found that while consolidation was legally permissible under Tennessee Rules of Criminal Procedure 8 and 13, it was not appropriate under the facts of this case.
Tennessee Rule of Criminal Procedure 8(b) provides for permissive joinder if the “offenses constitute parts of a common scheme or plan or if they are of the same or similar character.” The trial court issued a well-reasoned memorandum, finding that joinder was not appropriate under Tennessee Rule of Criminal Procedure 8(b) because it did not have sufficient evidence to support the theory that the offenses involved constituted a common scheme or plan. The court found that it had insufficient facts to establish that the modus operandi in the Davidson County incidents was probative of appellant’s identity in the Montgomery County incident. The trial court noted that the perpetrator in the Montgomery County incident removed the victims from the scene and killed them by cutting their throats with a knife, whereas the Davidson County perpetrator shot the majority of the victims at the two crime scenes. Therefore, the court concluded that it could not find that there was a unique method used in committing the crimes as required by State v. Hoyt, 928 S.W.2d 935, 943 (Tenn.Crim.App.1995). The trial court also found that although some of the witnesses would testify in the trials of all three offenses, many of the witnesses were necessary for only one of the trials. The trial court then reasoned that “capital trials are very lengthy and very complicated. A jury in this type of case is required to absorb, process, and evaluate a great deal of information. Given the limited factual similarities among the cases, consolidating them would create an unnecessary and, arguably, unmanageable burden on the jury.” The court’s memorandum on the issue of the factual appropriateness of consolidation spans five pages with citations to case law and the Rules of Criminal Procedure. Thus, appellant mischaracterized the trial court’s decision on consolidation by stating that it “gave no specific reason for its decision, simply explaining that the decision of whether to order consolidation is in the court’s discretion.”
Permissive joinder pursuant to Rule 8(b) of the Tennessee Rules of Criminal Procedure is governed by an abuse of discretion standard, and a trial court’s decision to consolidate offenses will not be reversed unless the court applied an incor *338 rect legal standard or reached a decision which is against logic or reasoning that caused an injustice to the party complaining. Spicer v. State, 12 S.W.3d 438, 442-43 (Tenn.2000).
Appellant asserts that he was prejudiced by the court’s decision not to consolidate. He asserts that “if the jury had been able to hear the details of the other, similar murders it might well have afforded the expert proof regarding Defendant’s well-documented mental illnesses more credence.” After a review of the record on this issue, this Court cannot conclude that the trial court abused its discretion in denying appellant’s motion to consolidate. This issue is without merit.
XX. [Deleted: Competency of Appellant to Stand Trial]
XXI. and XXII. Testimony of Rev. Joe Ingle, Mary Ann Hea, and Ron Lax at Competency Hearing
At the competency hearing, appellant sought to introduce the testimony of Reverend Joe Ingle, Mary Ann Hea, and Ron Lax. He asserts that these three witnesses would have testified as to appellant’s incompetency to stand trial. Appellant contends that the information possessed by these witnesses is absolutely critical to a fair determination of his competency to stand trial. Rev. Ingle was not allowed to testify because appellant refused to waive the priest/parishioner privilege. Defense counsel withdrew witnesses Hea and Lax because the court ruled that it would permit “wide open” cross-examination as to each of these witnesses on matters relevant to competency, even though defense counsel requested that the cross-examination of these witnesses be limited because they each worked with appellant’s “defense team” in connection with appellant’s Davidson County cases. The court determined that because these witnesses were part of appellant’s defense team, appellant would be required to waive the attorney/client privilege. Appellant refused to waive his privileges.
Rev. Joe Ingle, appellant’s minister, was prepared to testify that he had visited and counseled hundreds of mentally ill prisoners over the past twenty-five years, and appellant was the most mentally ill prisoner he had ever counseled. Rev. Ingle had spent more time with appellant than all of the expert witnesses combined. Appellant contends that, although Rev. Ingle is not a trained psychiatrist or psychologist, his lay perceptions of appellant mirror those offered by Drs. Auble and Amador, which is “highly significant.” In the affidavit' offered by Rev. Ingle, he states that appellant is obsessed with the desire to be normal. When he was able to break through appellant’s “mask of normalcy” and get him to reveal his true thoughts, he found appellant’s thinking bizarre and delusional. Appellant advised Rev. Ingle that he is being “set up” by the government. Appellant further contends that Rev. Ingle’s testimony would have provided a disinterested perspective on his mental health that could have rehabilitated the defense experts.
Mary Ann Hea is a social worker employed by the Davidson County Public Defender’s Office. Hea would have testified to the substance of her many interviews with appellant. The trial court held that because Hea was employed by the public defender’s office, she stood in the same position as an attorney. Thereafter, defense counsel excused Ms. Hea as a witness.
Appellant also sought to call Ron Lax as a witness at the competency hearing. Mr. Lax is a defense investigator involved in appellant’s McDonald’s murders case in Davidson County. The defense sought to *339 question Lax based upon two interviews with appellant during June 1999, and counsel requested that the court limit the State’s cross-examination of Lax to these two interviews. The trial court denied the request, ruling that on cross-examination the State would be entitled to ask Lax about all of the interviews he had conducted with appellant, and the State would be able to discover all of Lax’s reports of these interviews as Jenks material. As a result, the defense did not offer Lax as a witness.
Appellant acknowledges that Tennessee follows the “wide-open” approach to cross-examination but argues that cross-examination is limited to questions that are designed to elicit relevant evidence. See State v. Adkisson, 899 S.W.2d 626, 645 (Tenn.Crim.App.1994). Appellant asserts that because the defense experts testified that appellant was competent to stand trial until the late spring or early summer 1999, appellant’s competency to that point was not at issue, and the State should have been limited to questioning Lax as to his interviews of appellant following the appellant’s “deteriorated state” only. Otherwise, the trial court was authorizing the State to “delve into wholly irrelevant matters in its cross-examination.” The State counters that it should have been provided the oppoi’tunity to cross-examine the witness with regard to his conversations and interactions with the appellant touching on his competency and incompetency.
Tennessee Rule of Evidence 611(b) provides that the scope of cross-examination extends to “any matter relevant to any issue in the case, including credibility.” Because appellant’s competency was at issue, conversations and interactions Lax had with appellant prior to his determination that appellant was no longer competent would be relevant. The differences in appellant’s actions and statements in his prior interviews and the June 1999 interviews would be relevant, and they would certainly be an area ripe for cross-examination. Mr. Lax certainly made his determination as to appellant’s competency based upon his relationship and involvement in appellant’s case over the two year period he worked with appellant, rather than solely on the two June 1999 interviews. This court determines that the trial court did not abuse its discretion with regard to this ruling.
As for witnesses Hea and Ingle, appellant asserts that a criminal defendant has a due process right to call witnesses on his own behalf. Washington v. Texas, 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1976). Appellant then asserts that the trial court’s rulings with respect to these witnesses “impinged upon [his] right to present a defense to an unconstitutional degree” and cites Knight v. Dugger, 863 F.2d 705, 725-29 (11th Cir.1988). Appellant further contends that the trial court erred when it invoked mere evidentiary privileges to deny, or at least diminish, his right to call witnesses to support his claim of competency. The issue of the appropriate burden in establishing competency is of manifest importance to the issue of whether the trial court erred in allowing appellant to assert his privileges.
Appellant contends that the trial court’s rulings as to Ingle and Hea are incorrect because appellant was presumed to be incompetent at the hearing and, therefore, did not have the ability to assert or waive either the priest/parishioner privilege or the attorney/client privilege. The appellant relies upon the 1911 Tennessee Supreme Court case of Jordan v. State, 124 Tenn. 81, 135 S.W. 327, 329 (1911), and the case of State v. Black, 815 S.W.2d 166, 174 (Tenn.1991), for the proposition that the State bears the burden of proving a defen *340 dant’s competence to stand trial once the issue of competency is raised. It is the appellant’s position that, once competency is raised, a criminal defendant is presumed incompetent until the State proves otherwise. The State, however, asserts that the burden is on the criminal defendant to establish his incompetency to stand trial by a preponderance of the evidence and relies on United States v. Shepard, 538 F.2d 107, 110 (6th Cir.1976), and State v. Oody, 823 S.W.2d 554, 559 (Tenn.Crim. App.1991). The trial court asserted in its memorandum opinion on the motion for new trial that the law on the burden of proof is unclear. Appellant asserts that the supreme court cases of Jordan and Black place the burden of proof on the State by “approving” jury instructions that placed the burden on the State. Appellant submits that because the supreme court is the highest court in the state, the court of criminal appeals’ decision in Oody “is of no consequence.”
This Court determines that, based on Oody, the burden of proof at a competency hearing rests on the criminal defendant to establish incompetency to stand trial by a preponderance of the evidence. Appellant’s rebanee on Black and Jordan is misplaced. Jordan did not hold simply that the burden was on the State to prove competency by a preponderance of the evidence as argued by appellant. Rather, Jordan adopted a shifting of the burden when it found that the following jury charge was “in all things correct.” Jordan, 135 S.W. at 329.
The law presumes that all persons are of sound mind until the contrary is made to appear. When, therefore, any person charged with a criminal offense punishable by death or imprisonment pleads insanity, as in this case, and presents evidence establishing or tending to es-tabbsh the said plea, which evidence is sufficient to rebut and overturn the presumption of sanity, then it must be made to appear to your satisfaction from all the evidence that the defendant is of sufficient mental capacity to give sane advice to his counsel involving the charge in the indictment.
Id. at 328 (emphasis added). This charge does not support appellant’s contention that once the issue of competency is raised, the burden is on the State the prove competency. Instead, Jordan requires a shifting of the burden whereby the defendant must first present evidence establishing incompetency, rebutting and overturning the presumption of competency. If the presumption of competency is sufficiently rebutted, then the burden shifts to the State.
Further, the mere reference of a trial court’s statement in Black that the burden of proof was on the State to prove competency does not relegate that statement to the law in Tennessee. The holding in Black, relevant to the competency issue, was a determination that the criminal defendant in that case was competent to stand trial under the standards enunciated in the cases of Duskey, Mackey, and Benton, not who bore the burden at the competency hearing. Black, 815 S.W.2d at 173-75. Moreover, three months after the supreme court’s decision in Black, the Tennessee Supreme Court declined to grant permission to appeal in Oody and has not since addressed this issue.
Because appellant is presumed competent at the hearing, appellant had the right to assert his privileges, which prevented the witnesses at issue from testifying. This Court concludes that there was no error in the trial court’s rulings on this issue.
*341 XXIII. Testimony of Dr. Xavier Amador
Appellant contends that the trial court erred in forcing defense expert Dr. Xavier Amador to testify at the competency hearing without giving him sufficient time to: (1) review cassette tapes Dr. Bernet had recorded during his interview with appellant prior to the competency hearing and (2) review Dr. Turner-Graham’s report. The proof at the competency hearing was presented out of order due to Dr. Ama-dor’s scheduling constraints. The defense presented Dr. Pamela Auble as its first expert. Next, the State presented the testimony of Dr. Bernet, during which cassette tapes of a two horn* and fifteen minute interview with appellant were introduced. Dr. Cynthia Turner-Graham testified next. Following her testimony, the court asked defense counsel to call its next witness. Dr. Amador’s flight, however, had been cancelled the previous night, and he had not yet arrived. When Dr. Amador arrived, he was given Dr. Turner-Graham’s report and the tapes from Dr. Bernet’s interview for his review.
Defense counsel asked that Dr. Amador be given additional time to review the tapes and report upon his arrival. The trial court denied the request explaining that Dr. Amador had at least thirty minutes to review the report, and that he could review the tapes during the lunch break. Further, the court explained that defense counsel heard the tapes and could advise him concerning the same.
Dr. Amador never indicated that his testimony was compromised by insufficient time to review the report or the tapes. Appellant argues that, if Dr. Amador had been given additional time to review Dr. Bernet’s taped interview, he would have been better equipped to challenge Dr. Ber-net’s conclusions. This court finds that the record does not support appellant’s arguments on this issue. This issue is without merit.
XXIY. [Deleted: Testimony of Dr. Turner-Graham]
XXV. Testimony of Elfreida Lane
During Elfeida Lane’s redirect testimony, the prosecuting attorney asked her if she had ever been through the drive-thru window at Baskin-Robbins with her daughter and appellant. Ms. Lane replied, “We did not go through Baskin Robbins, sir.” Counsel then attempted to ask another question, and Ms. Lane interrupted and said, “that was my daughter that said that not — -we did not go through Baskin Robbins. Not to my knowledge.” Defense counsel then objected to the hearsay. The State responded that it had not intended to elicit hearsay testimony. The trial court sustained the objection and instructed the jury to disregard that portion of Ms. Lane’s testimony and consider it for no purpose. Thereafter, the State asked Ms. Lane if she and a member of her family and appellant had gone through the drive-thru at Baskin-Robbins. After Lane responded that she could not remember doing so, counsel asked if it was possible that, after they dined at Logan’s, they went to get ice cream. Ms. Lane stated that she could not remember doing so.
At no point during this exchange did defense counsel request a mistrial. Appellant now asserts that the court should have sua sponte granted a mistrial. A mistrial should be declared in a criminal trial only in the event of a “manifest necessity” that requires such action. State v. Hall, 976 S.W.2d 121, 147 (Tenn.1998) “The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict.” State v. Williams, 929 S.W.2d 385, 388 (Tenm.Crim. *342 App.1996). The determination of whether to grant a mistrial rests within the sound discretion of the trial court. State v. Smith, 871 S.W.2d 667, 672 (Tenn.1994). The reviewing court should not overturn that decision absent an abuse of discretion. Reid, 91 S.W.3d at 279. Moreover, the burden of establishing the necessity for a mistrial lies with the party seeking it. Williams, 929 S.W.2d at 388.
Appellant’s counsel did not move for a mistrial based upon the hearsay testimony by Ms. Lane. Moreover, the trial court gave a curative instruction, which the jury is presumed to have followed. Hall, 976 S.W.2d at 148. This issue is without merit.
XXVI. Testimony of Loretta Diorio and Stephen Diorio
During a break in the testimony of Stephen Diorio, he went into the hallway and sat with his mother, Loretta Dior-io, who had already testified. As they were sitting in the hallway, a news reporter was making a live broadcast concerning the trial. Appellant’s counsel immediately alerted the court and moved to strike the testimony of both Stephen and Loretta Diorio. The court questioned Stephen Diorio outside of the presence of the jury about what he had heard. Stephen admitted that he heard part of the news report and that the reporter stated that, after a long pause, “I pointed out the person.” He did not hear anything else the reporter said. The court then ruled that there was no Tennessee Rule of Evidence 615 violation. The court went on to state that, although witness Stephen Diorio could have been adversely affected and the Rule compromised, the same had not occurred.
On appeal, the appellant argues that the trial court erred. Tennessee Rule of Evidence 615 provides in pertinent part: “At the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing ... The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness.” Tenn. R. Evid. 615. The sequestration rule is designed to prevent witnesses from hearing the testimony of other witnesses and subsequently adjusting their testimony. State v. Harris, 839 S.W.2d 54, 68 (Tenn.1992). When a sequestration rule violation is raised on appeal, the court shall consider the seriousness of the violation and the prejudice, if any, suffered by the defendant. Id. at 68-69. In the case at bar, any violation was minor, appellant suffered no resulting prejudice. This issue is without merit.
XXVII. Introduction of Undergarment of Victim Angela Holmes
During the trial, Tobaris Holmes identified the clothing his wife was wearing on the night of her murder. The clothing was found at the crime scene and included Angela Holmes’s bra. The State moved for the admission of the articles of clothing into evidence without objection. Appellant now argues that the court should have removed the bra from evidence. Appellant argues that the bra had little or no relevancy and that any relevancy was outweighed by the prejudice it caused.
Appellant failed to object when the bra was admitted into evidence. The failure to make a contemporaneous objection constitutes a waiver, of the issue on appeal. Tenn. R.App. P. 36(a); see also State v. Little, 854 S.W.2d 643, 651 (Tenn.Crim.App.1992). This issue is without merit.
*343 XXVIII. Exclusion of TBI Memorandum
During the cross-examination of TBI agent Samera Zavero, appellant attempted to introduce into evidence a TBI memorandum, which stated that a person named James Jones could not be excluded as a possible donor of the DNA found on appellant’s right shoe. The trial court excluded the memorandum as irrelevant because there was no evidence that James Jones had anything to do with the case. Appellant argued that the memorandum was relevant because the State mentioned James Jones in opening statement.
During its opening statement, the State told the jury that the case had been a hard ease for law enforcement and the proof might show that appellant was not the first suspect in this case. Three men, Jones, Shelly, and Black, all of whom had a crack problem and were partying, taking guns, and selling them for crack, may have been the first suspects. Later in the opening, the State discussed the expected DNA evidence found on appellant’s shoes and commented “that’s why [the DNA evidence of] Jones and Shelly and Black were given up.” The trial court found that the mention of James Jones during opening statement was insufficient to establish the relevance of the document without any other evidence that James Jones had an involvement in the case.
Appellant contends that, because the State injected the name of James Jones into the issue of the identity of the perpetrator of the crimes, the memorandum is relevant. Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Tenn. R. Evid. 401. Relevant evidence “may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.” Tenn. R. Evid. 403. However, “[o]f critical importance here is the nature of opening statements. They are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove. Such statements do not amount to stipulations and certainly are not a substitute for the pleadings or for the evidence.” Harris v. Baptist Mem’l Hosp., 574 S.W.2d 730, 732 (Tenn.1978).
After a review of the evidence, we conclude that the trial court did not err in excluding the TBI memorandum. James Jones was never shown to have any involvement with the case. As such, any reference to him in a TBI memorandum is irrelevant to the determination of the facts at issue. Accordingly, this issue is without merit.
XXIX. Testimony of Jeffrey Potter
Appellant contends that the testimony of Jeffrey Potter should have been excluded because his conversation with appellant was too far removed in time from the Baskin-Robbins incident to provide meaningful insight into appellant’s motive. The testimony was about a conversation Mr. Potter had with appellant wherein the appellant told him robbery would be an easy way to make money. The trial court held a jury-out hearing to determine when the comment was made in relation to the Baskin-Robbins murders. Potter could not recall the date of the conversation but testified that the statement was made a few months before the Baskin-Robbins murders. He also testified that the statement was made in late summer 1996. Further, he could recall that the statement was made during appellant’s second term of employment with Shoney’s and that ap *344 pellant made the statement shortly before he was terminated. The court ruled that the statement was not too remote in time and allowed him to testify as to the statement.
Potter testified before the jury that appellant made the statement in January 1997, shortly before he was fired. Defense counsel questioned him on the discrepancy in his testimony, and he replied that he had gone home, thought about it, and tried to get everything right.
This court cannot find that the court erred in allowing Potter to testify as to the statement made by appellant. This issue is without merit.
XXX. Use of Styrofoam Heads by Dr. Harlan as Demonstrative Evidence
Appellant challenges the use of demonstrative evidence by the medical examiner as inappropriate. During Dr. Harlan’s testimony, he used styrofoam heads to demonstrate, with a pen, the head wounds suffered by the victims. This court approved the use of this type of demonstrative evidence in State v. Robert E. Cole, No. 02C01-9207-CR-00165, 1993 WL 539185, at *3 (Tenn.Crim.App. at Jackson, Dec. 30, 1993). In Cole, this Court concluded that the evidence was “highly probative as to the issues to be decided by the jury. Under the circumstances, the trial court did not err in admitting the challenged evidence.” Id. (citing State v. King, 718 S.W.2d 241 (Tenn.1986); State v. Sexton, 724 S.W.2d 371 (Tenn.Crim.App.1986)).
This court cannot find that the use of the styrofoam heads was inappropriate in this case as the appellant urges. The trial court did not err in its ruling that the use of the styrofoam heads would assist Dr. Harlan in demonstrating the location of the wounds. This issue is without merit.
XXXI. [Deleted: Failure to Allow Introduction of Police Report]
XXXII. [Deleted: Sufficiency of the evidence]
XXXIII. Prosecutorial Misconduct in Guilt Phase
Appellant contends that the prosecutors committed numerous acts of prosecutorial misconduct during their arguments in the guilt phase.[3] When reviewing allegations of prosecutorial misconduct, “[t]he general test to be applied is whether the improper conduct could have affected the verdict to the prejudice of the defendant.” Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758, 759 (1965); see also State v. Richardson, 995 S.W.2d 119, 127 (Tenn.Crim.App.1998). *345 The factors relevant to the court’s determination are:
1. The conduct complained of viewed in light of the facts and circumstances of the case;
2. The curative measures undertaken by the court and the prosecution;
3. The intent of the prosecutor in making the improper arguments;
4. The cumulative effect of the improper conduct and any other errors in the record; and
5. The relative strength and weakness of the case.
Nesbit, 978 S.W.2d at 894.
Reference to Danny Tackett’s testimony
During opening statement, the prosecutor commented:
You are going to hear testimony from Danny Tackett and maybe another coworker ... We think Mr. Tackett is going to tell you that he worked with Mr. Reid at a Shoney’s ... and that there was talk when the two of them worked about raising money, not by donating money at the Plasma center or anything like that. There was talk about raising money by conducting robberies.
Defense counsel objected, and the court conducted a sidebar conference. The court reminded defense counsel that Tack-ett’s testimony about the conversation would be admissible at trial, a finding he had previously made. The court then advised the prosecutor to limit his remarks to anticipated evidence that he believed in good faith would be forthcoming, not otherwise. At trial, Tackett testified that when appellant asked him about how he could get money, he suggested committing robbery as a means of making money and mentioned a “fast food place, you know, middle of night, no witnesses.” Tackett agreed that he made the suggestion to appellant.
Appellant argues that the prosecutor’s comment during opening statement intimated that appellant, not Tackett, made the robbery statement about committing a robbery; therefore, the prosecutor committed misconduct. The prosecutor’s comments regarding Danny Hackett’s suspected testimony were not improper. Moreover, the comments could not have affected the verdict to the prejudice of appellant, because the jury heard Tackett testify he brought up the robbery suggestion. This issue is without merit.
Writing of the word “match” on visual aid
During closing argument, the prosecutor used a visual aid in connection with his argument as to the fiber evidence in the case upon which the word “match” was written. The defense objected, arguing that the word “match” implied identity, whereas the testimony of the expert witness had been that the fibers found on the victims’ clothing were “consistent” with fibers found in appellant’s car. The trial court overruled the objection, stating, “The rules provide that the closing argument by the State is limited to the subject matter covered in the State’s argument and the argument by the defendant. Also the law provides that counsel may comment on the evidence and reasonable inferences that may be drawn therefrom. Discussion about fibers was included in the State’s opening argument. It was also covered by the defendant in his argument. So, the rules provide that subject matter is fair game.” The trial court further explained, “The specific use of the word match ... if he uses it, that’s his take on the evidence. He can comment on what he thinks the evidence is ... The jury heard the evi *346 dence, and its [sic] up to them to sort out whether his use of the word match is appropriate or not.”
The closing argument is a valuable privilege for both the State and the defense and counsel is afforded wide latitude in presenting final argument to the jury. See State v. Cribbs, 967 S.W.2d 773, 783 (Tenn.1998); State v. Cone, 665 S.W.2d 87, 94 (Tenn.1984). However, when a prosecutor’s argument “veers beyond the wide latitude afforded, the test for determining if reversal is required is whether the impropriety ‘affected the verdict to the prejudice of the defendant.’ ” Cribbs, 967 S.W.2d at 783. Appellant argues that the use of the word “match” characterized the proof as much stronger than it actually was, which thereby misled the jury. The prosecutor did not exceed the latitude given him in writing the word match on the visual aid. Moreover, the word “match” on the visual aid did not affect the verdict to the prejudice of appellant. The jury heard the experts’ testimony that the fibers on the victims’ clothes were “consistent.” The experts were thoroughly cross-examined on this point. Additionally, the jury was instructed that arguments of counsel are not to be considered evidence. The jury is presumed to follow instructions. State v. Smith, 893 S.W.2d 908, 914 (Tenn.1994). This issue is without merit.
Appeal to jury’s passion
In closing argument, the prosecutor placed pictures of each victim on a projector and left them there for seven minutes. At some point, the prosecutor threw dollar bills on the projector used to display the images of the victims. Appellant asserts that, by these acts, the prosecutor intended to inflame the passion of the jury, which is prohibited. See Watkins v. State, 140 Tenn. 1, 203 S.W. 344, 345-46 (1918). The State argues that the prosecutor was simply demonstrating to the jury that it was money that motivated appellant to rob, kidnap, and murder the victims, whose pictures were being projected, and to eliminate the victims as witnesses. These actions, although dramatic, were not “conduct so improper that it affected the verdict.” Harrington, 385 S.W.2d at 759. This issue is without merit.
Biblical reference
In closing argument, the prosecutor stated, “No matter how hard you try murder will out. If necessary the stones themselves will cry out. The shoes themselves will cry out as they did in this case. They will show the blood. Blood will out, and it did in this case. He couldn’t get rid of every speck of blood.” Appellant contends that this argument was based on a passage from the book of Habbukuk in the Bible. Habbukuk 2: 9-11 reads as follows:
9. Woe to him who gets evil for his house, to set his nest on high, to be safe from the reach of harm!
10. You have devised shame to your house by cutting off any peoples; you have forfeited your life.
11. For the stone will cry out from the wall, and the beam from the woodwork respond.
Habbukuk 2:9-11 (Revised Standard Edition). Appellant did not make a contemporaneous objection to the prosecutor’s comments. Therefore, this issue is waived. See Thornton, 10 S.W.3d at 234 (citing Tenn. R.App. P. 36(a)); Green, 947 S.W.2d at 188; Little, 854 S.W.2d at 651.
Although appellant did not make a contemporaneous objection to the Biblical reference, he moved for a mistrial after the completion of the State’s closing argument and after the jury had left the courtroom. *347 Appellant argued that based on the totality of the prosecutor’s argument, specifically including the Biblical reference, the pictures of the victims on the projector for seven minutes, the latex gloves comments, and the bank of justice analogy, the argument appealed to the passion and sympathy of the jury. A mistrial should be declared in a criminal trial only in the event of a “manifest necessity” that requires such action. Hall, 976 S.W.2d at 147. “The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict.” Williams, 929 S.W.2d at 388. The determination of whether to grant a mistrial rests within the sound discretion of the trial court. Smith, 871 S.W.2d at 672. The reviewing court should not overturn that decision absent an abuse of discretion. Reid, 91 S.W.3d at 279. In this case, the trial judge found there was no manifest necessity requiring a mistrial. We agree.
On appeal, appellant correctly notes that any references to the Bible during closing argument are prohibited. See Cribbs, 967 S.W.2d at 783. The supreme court has held a Biblical reference to be harmless error. See id. at 783 (holding prosecutor’s quotation to the Bible, “Whatever a man sows, so shall be reaped” as harmless). In Cribbs, the prosecutor acknowledged in his closing that it made him uncomfortable to mention Biblical references, but he then quoted the reap what you sow passage. Id. He then explained to the jury that he did not want anyone to be offended by the Biblical reference, but it was a very important part of our law. Id. Notwithstanding, the court held that the prosecutor’s comments were harmless because they did not affect the verdict of the jury.
In the order denying appellant’s motion for new trial, the trial court found that the reference was of a religious nature and constituted error, but found that it was harmless. The court noted that the “passage is one of relative obscurity. Therefore, the court finds it unlikely that the jurors were actually aware of the remainder of the passage and/or its meaning. This is particularly true given the context of the reference.” Based on our review of the record, we find that the prosecutor’s Biblical reference did not affect the verdict to the prejudice of appellant and that the trial court did not abuse its discretion. Therefore, this issue is without merit.
XXXIV. Life Photographs of Victims
Appellant challenges the introduction of photographs of the victims before they were murdered during the victim impact testimony. Appellant asserts that the photographs served only to inflame the jurors and appeal to their emotions. The State counters that the photographs were probative of the issue of the impact of the death on the victims’ family members and to show those unique characteristics which provide a brief glimpse into the life of the victims. The supreme court has held:
[generally, victim impact evidence should be limited to information to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual’s death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim’s immediate family.
Nesbit, 978 S.W.2d at 887. In this case, the photographs were introduced to provide a brief glimpse into the fives of the victims, as allowed by Nesbit. Accordingly, the court did not err in allowing the introduction of these photographs.
*348 XXXV. [Deleted: Photographs of Victims at Crime Scene]
XXXVI. Victim Impact Testimony of Tobaris Holmes
Appellant next contends that the trial court should have excluded the victim impact testimony of Tobaris Holmes during the penalty phase, wherein Mr. Holmes testified that his daughter Ryane “kisses Angela’s picture and not Angela.” This testimony was given in response to the prosecutor’s question, “Mr. Holmes, how has Angela’s murder affected your family?” Appellant did not object to Mr. Holmes’s testimony; therefore, this issue is waived. See Thornton, 10 S.W.3d at 234 (citing Tenn. R.App. P. 36(a)); Green, 947 S.W.2d at 188; Little, 854 S.W.2d at 651. Further, we find that this statement was proper victim impact testimony under Nesbit, 978 S.W.2d at 879. Accordingly, this issue is without merit.
XXXVII. Testimony of Patricia Allen
Patricia Allen testified at the penalty phase as a speech language pathologist. She testified that she evaluates people with brain injuries to determine if they have been affected by the brain injury. She explained that “language is a code that reflects how someone is thinking.” She then testified that, in evaluating a patient, she would look at their “reading and writing and the words they put together in sentences, we would also look at their thinking skills; things such as their ability to attend, to remember, to solve problems and to reason. Things like that.” She further explained that a speech language pathologist was more involved in treatment and helping people with brain injuries to function, while a neuropsychologist would be more involved in the evaluation of how the brain is working and the behavior of the individual.
Later in defense counsel’s direct examination of Ms. Allen, counsel asked how appellant’s brain injury would have impacted his ability to conform to the rules established in the home. The State objected, arguing that such was outside her area of expertise. The court overruled the objection, and the witness responded. Next, after Ms. Allen confirmed that people with brain injuries have difficulty with rules, defense counsel asked: “How so?” Again, the State objected to the questioning as being outside Ms. Allen’s area of expertise. This time the court sustained the objection.
It is the longstanding principle that the “propriety, scope, manner and control of examination of witnesses is within the trial court’s discretion.” Harris, 839 S.W.2d at 72. Ms. Allen testified that she, as a speech language pathologist, was more involved in treatment and helping people with brain injuries to function, while a neuropsychologist was more involved in the evaluation of how the brain is working and the behavior of the individual. Accordingly, the trial court did not err in precluding Ms. Allen from testifying as to how a person with a brain injury would have difficulty with rules. Moreover, as the trial court found, any such error in precluding the testimony was harmless. Appellant did not make an offer of proof. Therefore, he failed to demonstrate how he was prejudiced by the trial court’s ruling. See State v. Galmore, 994 S.W.2d 120, 125 (Tenn.1999) (although an offer of proof is unnecessary to preserve this issue, it may be the only way to demonstrate prejudice). Furthermore, Ms. Allen and the other defense experts testified at length as to appellant’s physical and mental abnormalities and the effects of the same. Therefore, any error in sustaining the State’s objection was harmless. This issue is without merit.
*349 XXXVIII, XXXIX and XL. Jury Charge of Mitigating Factors
Appellant contends that the trial court erred in charging the jury as to mitigating factors in three respects. First, he contends that the trial court erred in refusing to charge the jury on the statutory mitigator set forth in Tennessee Code Annotated section 89 — 18—204(j)(6), which provides that “the defendant acted under extreme duress or under the substantial domination of another person.” Appellant contends that his delusions caused him to believe he was acting under the control of government agents and, as a result, the “substantial domination” mitigator should have been charged. There is no authoritative support for appellant’s contention. Moreover, appellant’s mental illnesses were addressed in the statutory and non-statutory mitigators charged to the jury.
Next, appellant contends that the trial court erred by failing to charge the non-statutory mitigators in the same affirmative manner as the statutory mitigators. Basically, appellant attacks the non-statutory mitigators because they were not in the same “sentence structure” as the statutory mitigators. The charge the trial court gave complies with the non-statutory instructions approved by the Supreme Court in Odom, 928 S.W.2d at 31-32, and State v. Hodges, 944 S.W.2d 346, 352 (Tenn.1997). This issue is without merit.
Finally, appellant contends that the trial court should have charged the “catch-all” mitigator set forth in Tennessee Code Annotated section 39 — 13—204(j)(9). Appellant did not, however, raise this issue at trial or in his motion for new trial. Failure to make a contemporaneous objection constitutes a waiver of the issue. See Thornton, 10 S.W.3d at 234 (citing Tenn. R.App. P. 36(a)); Green, 947 S.W.2d at 188; Little, 854 S.W.2d at 651. Moreover, failure to raise issues concerning jury instructions in a motion for new trial constitutes a waiver of such issues for purposes of appeal. Tenn. R.App. P. (3)(e); Tenn. R.App. P. 36(a).
Notwithstanding appellant’s failure to object or raise the issue in a motion for new trial, he contends that the trial court’s failure to charge the catch-all miti-gator constitutes plain error and should be reviewed by this court. See Tenn. R.Crim. P. 52(b); State v. Ogle, 666 S.W.2d 58 (Tenn.1984). Plain error exists where the error affects a substantial right of the defendant and strikes at the very fairness or integrity of the trial. Tenn. R.Crim. P. 52(b); State v. Wooden, 658 S.W.2d 553, 559 (Tenn.Crim.App.1983). The failure to charge the catch-all statutory mitigator does not strike at the very fairness or integrity of the trial and, therefore, does not constitute plain error. This issue is without merit.
XLI. Trial Court Comments on State’s Proof During Penalty Phase
At the conclusion of the court’s explanation to the jury of the sentencing process, the court stated:
But I say this only because I want you to develop your mind now with a view to looking to the State to offer evidence regarding the aggravating circumstances they contend apply, remembering that you must be convinced beyond a reasonable doubt and also applying the guidelines as I give you in my instructions that tell you how to go about considering those aggravating circumstances and whether or not they outweigh beyond a reasonable doubt the mitigation evidence, if you find such exists, that has been raised during the course of the trial.
Appellant argues that this statement by the court encouraged, at least implicitly, *350 the jury to concentrate on the State’s proof as opposed to that raised by appellant. Appellant has failed to allege how this statement prejudiced him. This issue is without merit.
XLII. [Deleted: Prosecutorial Misconduct During Penalty Phase]
XLIII. [Deleted: Heinous, Atrocious and Cruel Aggravating Factor]
XLIV. [Deleted: Sufficiency of Evidence to Support Jury’s Finding that Aggravating Circumstances Outweighed Mitigating Factors Beyond a Reasonable Doubt]
XLV. [Deleted: Proportionality Review]
CONCLUSION
In accordance with Tenn.Code Ann. § 39-13-206(c), we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury’s finding of the statutory circumstances, that the evidence supports the jury’s finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and that the sentence is not disproportionate. We have also reviewed all issues raised by appellant and conclude there is no reversible error. As a result, the judgments of the trial court and the sentence of death imposed by the jury are affirmed.

. I have urged adopting a protocol in which each case would be compared to factually similar cases in which either a life sentence or capital punishment was imposed to determine whether the case is more consistent with “life” cases or "death” cases. See State v. McKinney, 74 S.W.3d at 321 (Birch, J., concurring and dissenting). The current protocol allows a finding proportionality if the case is similar to existing death penalty cases. In other words, a case is disproportionate only if the case under review "is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed.” Bland, 958 S.W.2d at 665 (emphasis added).

. In my view, excluding from comparison that group of cases in which the State did not seek the death penalty, or in which no capital sentencing hearing was held, frustrates any meaningful comparison for proportionality purposes. See Bland, 958 S.W.2d at 679 (Birch, J., dissenting). The majority justifies its decision not to include such cases by stating that it would be inappropriate to review the exercise of prosecutorial discretion. However, I note that in a July 2004 study conducted by the State Comptroller on the costs and the consequences of the death penalty, one of the conclusions was that prosecutors across the state are inconsistent in their pursuit of the death penalty. In my view, this inconsistency contributes to arbitrariness in the imposition of the death penalty. See John G. Morgan, Comptroller of the Treasury, Tennessee’s Death Penalty: Costs and Consequences 13 (July 2004), available at www.comptroller.state.tn.us/orea/reports.

.As I stated in my concurring/dissenting opinion in State v. GodLsey, "[t]he scope of the analysis employed by the majority appears to be rather amorphous and undefined — expanding, contracting, and shifting as the analysis
*325 moves from case to case.” 60 S.W.3d 759, 797 (Tenn.2001) (Birch, J., concurring and dissenting).

. The evidence seized from appellant’s car and home and the samples taken from appellant's person, which were ultimately used in the trial at issue, were seized as a result of the investigation of the Captain D's murders in Nashville and were introduced as evidence in the Captain D’s murder trial.

. On appeal of his convictions in the Captain D’s murders, appellant did not challenge warrant 145, authorizing the search of his car, but the Supreme Court's analysis is equally applicable to warrant 145.

. Among other things, appellant challenges: (1) the State’s reference to the DNA database as "big, huge” as misleading to the jury; (2) the implication by the State that appellant had committed other murders by referring to the murders in "this county” and “our county;” (3) the implication by the State that appellant failed to testify; (4) the State’s reference to the donor of blood on the shoes of appellant as belonging to the victims; (5) the State’s reference to latex gloves that were found at the crime scene and their connection with appellant; and (6) the State’s "bank of justice analogy” in closing argument that indicated it was the jury’s civic duty to find appellant guilty. Appellant failed to make objections to these alleged instances of prose-cutorial misconduct at trial. Appellant’s failure to object constitutes waiver of these issues on appeal. State v. Thornton, 10 S.W.3d 229, 234 (Tenn.Crim.App.1999) (citing Tenn. R.App. P. 36(a)); State v. Green, 947 S.W.2d 186, 188 (Tenn.Crim.App.1997); Little, 854 S.W.2d at 651 (holding that failure to object to prosecutor's alleged misconduct during closing argument waives later complaint). Accordingly, these issues are without merit.